

COURT EXHIBIT
I
09-cr-00389

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Criminal Case No. 09-cr-00389-WYD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. XCEL ENERGY, INC.,
2. PUBLIC SERVICE COMPANY OF COLORADO,
3. RPI COATING, INC.,
4. PHILIPPE GOUTAGNY, and
5. JAMES THOMPSON,

      Defendants.

---

## RULE 11(c)(1)(A) and (B) PLEA AGREEMENT AND STATEMENT
## OF FACTS RELEVANT TO SENTENCING

---

      The United States of America, by and through John F. Walsh, United States Attorney for the District of Colorado, Jaime A. Pena, Assistant United States Attorney, and the defendant, RPI Coating Inc. by its duly authorized representative Philippe Goutagny and by counsel, Larry Pozner and Dru Nielsen, submit the following Plea Agreement and Statement of Facts Relevant to Sentencing pursuant to D.C.COLO.LCrR 11.1 and Fed. R. Crim. P. 11(c)(1)(A) and (B).

### I. PLEA AGREEMENT

      Defendant RPI Coating, Inc.(sometimes referred to herein as RPI) agrees to plead guilty to Counts One through Count Five of the Indictment respectively charging violations of Title 29 U.S.C. § 666 (Violation of OSHA Regulations Resulting in Death).

      The Defendant RPI and its representatives agree to execute the necessary

documents and pleadings necessary to effect this plea agreement, including but not limited to the execution of minutes authorizing this plea agreement, the arraignment of the defendant corporation, and the authorization for a representative to represent the corporation at sentencing.

The Defendant further agrees to cooperate with the Government in its investigation and prosecution of any other individuals and entities.

The Defendant understands that any recommendation by the Government to the Court is merely a recommendation and the Court will exercise its discretion, within the law, in determining a just sentence.

The Government also agrees to move to dismiss the remaining count, Count 6, of the Indictment against this defendant, and the charges against Phillippe Goutagny and James Thompson at the time of the sentencing.

The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless the sentence imposed is above the maximum penalty provided in the statute of conviction. Except as provided above, the defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742 or any ground whatever. The defendant also knowingly and voluntarily waives his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. This waiver provision, however, will not prevent the

2

defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct. Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from this waiver provision.

As part of this disposition, the parties agree to recommend a sentence of probation for a period of five years, which upon violation may include a fine of up to $2,500,000 with the following specific terms:

(1)     RPI will, immediately upon sentencing, tender one or more cashier's checks to the United States Attorney's office for the District of Colorado payable to the persons/victims/heirs, recognizing these funds are designated as personal injury damages for tax purposes, in the amounts stated below:

| Victim/Decedent | Heir/Beneficiary | Relationship | Amount |
|---|---|---|---|
| Gary Foster | Elizabeth Foster | Wife | $164,640.00 |
| Don DeJaynes | Carolynn DeJaynes | Wife | $260,640.00 |
| Dupree Holt | Gladys Holt | Wife | $314,640.00 |
| Anthony Aguirre | Ortencia Aguirre | Mother | $164,640.00 |
| James St. Peters | Christopher St. Peters | Son | $82,320.00 |
|  | Tiffany St. Peters | Daughter | $82,320.00 |
| Kenneth Shinn | N/A |  | $51,450.00 |

3

| Manuel Villareal | N/A | | $51,450.00 |
|---|---|---|---|
| Joe Vance | N/A | | $51,450.00 |
| Eric Thomas | N/A | | $51,450.00 |

Additionally, RPI will tender to the United States Attorney's office one or more cashier's checks in the sum of $275,000.00 to be transferred to civil counsel as attorneys fees and costs associated with collateral civil litigation.

The total amount of compensation tendered to the United States Attorney's office for distribution is **$1,550,000.00**. This amount includes the $275,000 described above. The Government and the Defendant stipulate that this amount is compensation to victims and their families. Upon payment of these funds as described, RPI will receive an acceptable release of civil liability and release of all of the serious and willful claims pending in California. In addition it is understood that there is no further restitution owed in this criminal case.

(2) The defendant shall not knowingly, intentionally, willfully, or because of willful blindness, violate state or federal criminal law. The defendant also shall not knowingly, intentionally, willfully, or because of willful blindness, violate Section 5(a) of the Occupational Safety and Health Act (29 U.S.C. 654(a)), or the occupational safety and health requirements of an approved state plan (see 29 U.S.C. 667), in any workplace wherever located. The defendant shall also commit no violation of the Occupational Safety and Health Act, or of any requirement of an approved state plan, in any workplace wherever located, that is substantially similar to any violation of 29 CFR 1910 listed in

4

Section IV below, and which would be classified as a "high gravity serious"[1] violation if committed in a Federal OSHA jurisdiction. In the event the United States alleges that the defendant has not complied with this paragraph, the Court in this criminal proceeding shall determine whether such violation has been committed, whether it meets the criteria described herein, and whether such violation is of such nature that probation should be revoked.

(3) The defendant agrees to pay $100,000.00 in fines and penalties to "USDOL-OSHA", as a settlement of administrative fines and penalties assessed against the defendant in OSHRC Docket No. 08-0656. This administrative fine shall be paid at the time of sentencing. The defendant shall comply with all other provisions of the separate administrative settlement agreement in OSHRC Docket No. 08-0656.

## II. <u>STATUTORY PENALTIES</u>

The maximum statutory penalty for each of the violations of Title 29 U.S.C. § 666 (Counts 1-5) is a term of imprisonment of not more than 6 months, and not more than $500,000 fine, or both, and one (1) year supervised release, and $50 special assessment fee. Because the defendant is a corporation/organization, the maximum penalty for a violation of each of Counts One through Five is a fine of up to $500,000.00 on each count, pursuant to 18 U.S.C. §§ 3571(c)(4) and 3571(e), for a total maximum fine of $2,500,000.00.

---

[1] A "high gravity serious" violation is a violation in which the severity of any potential injury or illness is high (i.e., death from injury or illness, injury involving permanent disability, or chronic, irreversible illness), and the probability that an injury or illness will result from a hazard is categorized as "greater." See OSHA's Field Operations Manual (FOM), CPL 02-00-150, Chapter 6, Section III (April 22, 2011).

### III. ELEMENTS OF THE OFFENSE

The elements of the offense, a violation of Title 29, United States Code, Section 666(e), are as follows:

    (1)    *First*: The defendant was an employer[2] at the work site;

    (2)    *Second*: The defendant willfully[3] violated an applicable OSHA regulation(s);[4]

    (3)    *Third*: The violation caused the death of any employee.[5]

### IV. STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree that there is no dispute as to the material elements that establish a factual basis for the offense for conviction. Pertinent facts are set out below in order to

---

[2] The statute applies to "any employer" at a work site, not merely the direct employer of a particular worker. 29 U.S.C. 666(e); *United States v. Pitt-Des Moines*, 168 F.3d 976 (7th Cir.); See also, *United States v. Cusack*, 806 F.Supp. 47, 49 (D.NJ. 1992) (pursuant to § 652(5) an employer is "...a person engaged in a business affecting commerce who has employees..." and § 652(4) defines a person as "one or more individuals, partnerships, associations, corporations, business trusts, legal representatives, or any organized group of persons.").

[3] The term "willful" means "...done knowingly and purposely by an employer who, having a free will or choice, either intentionally disregards the standard or is plainly indifferent to its requirement." *United States v. Pitt-Des Moines*, 168 F.3d 976 (7th Cir.) citing *United States v. Dye*, 510 F.2d 78, 81 (10th Cir. 1975).

[4] As cited in the Indictment.

[5] 29 U.S.C. 666(e); *United States v. Pitt-Des Moines*, 168 F.3d 976 (7th Cir.); See also, *United States v. Cusack*, 806 F.Supp. 47, 49 (D.NJ. 1992) (pursuant to § 652(6) an employee is "an employee of an employer who is employed in a business of his employer which affects commerce.").

provide a factual basis for the plea and to provide facts that the parties believe are relevant, pursuant to U.S.S.G. § 1B1.3, for computing the appropriate guideline range. To the extent the parties disagree about the facts relevant to sentencing, the statement of facts identifies those facts known to be in dispute at the time of the plea. U.S.S.G. § 6B1.4(b).

The statement of facts herein does not preclude either party from presenting or arguing, for sentencing purposes, additional facts or factors not included herein that are relevant to the guideline computation, U.S.S.G. § 1B1.3, or to sentencing in general. U.S.S.G. § 1B1.4. "[I]n determining the factual basis for the sentence, the Court will consider the stipulation [of the parties], together with the results of the presentence investigation, and any other relevant information." U.S.S.G. § 6B1.4, comment.

The parties agree that the date on which conduct relevant to the offense (U.S.S.G. § 1B1.3) began is in or about June 2007, and contining until October 2, 2007, and includes the deaths of all five workers. The parties agree that the Government's evidence would be as follows:

A.     Public Service Company of Colorado (sometimes referred to herein as PSCO) is a company owned, operated and controlled by Xcel Energy Inc. (sometimes referred to herein as Xcel) that owns the Cabin Creek Hydroelectric Plant, including the penstock, that sits on 268 acres of U.S. Forest Service land. Xcel and PSCO operate and provide the manpower and expertise to operate the hydroelectric plant located above Georgetown, Colorado (the "Cabin Creek Hydroelectric Plant"). At all times alleged Xcel and PSCO acted in association with each other for their mutual benefit and aided and abetted each other and others. During periods of peak electricity demand, electricity is

7

generated by releasing water from the upper reservoir through a tunnel, referred to as a penstock, which then turns reversible pump turbine generators at the lower end of the penstock. When electricity demand is low, water is pumped back up to the upper reservoir. The upper reservoir is connected to the plant by the 4,150 foot long penstock that runs through a mountain. As described below, in 2007, Xcel Energy, Inc. and Public Service Company of Colorado contracted with RPI Coating, Inc. to perform the maintenance work on the penstock. RPI Coating, Inc. is a specialty coatings application company headquartered in Sante Fe Springs, California. Both Xcel Energy, Inc. and Public Service Company of Colorado participated in the planning, bidding, review, execution, and supervision of the penstock relining project.

B.      The Cabin Creek penstock has been in service since approximately 1967. Since then, Xcel Inc. and Public Service Company of Colorado have owned, operated and had exclusive control over the penstock.

C.      The upper section of the penstock is a 15-foot diameter concrete pipe dropping vertically about 20 feet, then dropping at a 55 degree angle for approximately 1,000 feet. The middle section of the penstock is a 15-foot diameter concrete pipe dropping at a 10 degree angle for approximately 1,500 feet. The lower section of the penstock is an approximately 12-foot diameter steel pipe dropping at a 2 degree angle for approximately 1,500 feet, then dropping 45 degrees for about 50 feet into turbines. This steel pipe section of the penstock had a lining to protect the steel from the water, which could corrode the steel and weaken the structure.

D.      In December 2006, Xcel began planning a project to reline the penstock after it determined that the existing coal tar epoxy liner was nearing the end of its service life. By

8

that time, the coal tar epoxy lining was experiencing flaking, blistering, and checking. Numerous areas of rusting and shallow pitting were also present. The project was a preventative maintenance plan that included the draining and inspection of the penstock, removal of the existing liner by abrasive blasting of the 1560-foot steel portion of the penstock, and relining the steel section of the penstock with a 2-part epoxy coating. The penstock blasting and relining project involved the draining and decommissioning of the entire 4,150-foot penstock for more than two months, de-watering the penstock, diverting the stream feeding the reservoir, blasting off the old liner, spot-welding the interior of the penstock, inspecting and preparing the surface, and applying the new epoxy liner. Every time the penstock is de-watered, there is significant risk of collapsing the penstock if the drainage rate is not correct. This was the first time in the penstock's 40-year existence that Xcel had ever performed such a project. Xcel determined it would subcontract out the relining project. The estimated cost of the project was over $1.4 million (not including lost revenue), and RPI estimated that the project would require 7,000 hours of craft labor.

E.     In April 2007, Xcel sent bidders an initial Request for Proposal (RFP) to reline the Cabin Creek penstock. All bidders were directed to submit bids by the end of May. Because of insufficient qualified bidders, on June 19, 2007, less than three months before the relining project was slated to begin, Xcel issued a new Request for Proposal ("RFP") for the relining of the penstock. Proposals were due back from bidders less than one month later, on July 13, 2007. RPI submitted its bid on July 13, 2007. The RFP specified Duromar as one of two acceptable coatings for the penstock. As part of the bid process, Xcel required each bidder to answer a safety questionnaire for Xcel's review and to provide a site safety plan, which was not submitted by RPI. Xcel's policy was to reject contractors

9

who have a poor safety and health program. Xcel directed that the project would begin on September, 4, 2007 and be completed by November 16, 2007, just prior to the holiday season when energy consumption was expected to increase.

    F.    Xcel held several pre-bid meetings discussing the various aspects of the project. Ken Shafer, Xcel Safety Consultant, participated in these meetings to evaluate the safety issues associated with the project. Xcel was to establish safety protocols for the project and coordinate them with the selected bidder's safety program. Xcel employees John Keahey (principal engineer and project manager), Bruce Cotie (head of the Cabin Creek plant), and Ken Shafer were all on the site prior to the project commencing. They knew the location of the penstock as well as the distance between the penstock and the town of Georgetown, Colorado.

    G.    On May 10, 2007, KM Industrial, a Specialty Coatings contractor expressed concerns about the project to Xcel through Neil Stephenson. These concerns included the fact that there would be only one access point into the penstock. KM Industrial asked Xcel if it would consider allowing additional access points to be installed in the penstock because such additional access "would cut down the enormous length for access in the event of an unforeseeable incident, as well as allow the penstock to be ventilated to conform to standard ventilation/safety procedures." Xcel ultimately declined to create a second access point which resulted in KM Industrial's withdrawn from the bid process.

    H.    An Xcel document entitled "Cabin Creek Penstock Major items of concern" indicates the major areas of concern for the project, including (1) "only one point of access," (2) "the distance from the opening to the upper limit of the steel-lined section is nearly 1600 feet," (3) "weather," including "most of the coatings with which I'm familiar

10

require application in reasonbl[y] temperate conditions . . . . The tunnel tends to act like a chimney and it will take some doing to control the climate in this large a volume of space", and (4) the "time interval" required, including draining the penstock and the coating curing time, about which Xcel employee Keahey stated: "I'm not sure this is enough time under the best of conditions. (And this time of year will not lend itself to the best of conditions.)"

I.      On July 11, 2007, before RPI was awarded the contract, Xcel conducted an emergency response drill with local fire and emergency crews. However, that drill was not conducted inside the penstock. The Clear Creek Fire Authority requested that Xcel give it an opportunity to conduct a drill within the penstock, but Xcel declined to follow through with that request. As a result, when the responders arrived at the penstock on the day of the fire, they were not appropriately prepared to conduct a rescue in the penstock. Mark Abrahamson, the Assistant Fire Chief of the Clear Creek Fire Authority, had discussions with Xcel prior to commencement of the project, and prior to RPI being awarded the contract. It was Mr. Abrahamson who requested pre-project access to the penstock due to the size and location of the fire department, and so that the fire department could come up with a preplan in case they had to respond to an emergency at the penstock during the project. Mr. Abrahamson made it clear to Xcel and its authorized representatives that it would be difficult to respond to an emergency at the penstock based on the size of the project alone. Xcel did not provide the fire department an opportunity to conduct a drill in the penstock prior to the commencement of the project.

J.      On July 30, 2007, Xcel agreed that RPI "be the one selected [for the project] due to cost and the fact that they are qualified." Xcel conducted its own investigation of RPI's safety record and ultimately approved RPI as the contractor for the project.

11

K.     On August 14, 2007, RPI signed the contract with Xcel. Per Xcel's timeline, the job began less than a month later, on September 5, 2007. Xcel added an addendum to the RPI contract stating that Xcel would perform on-site safety inspections to ensure RPI's adherence to Xcel's safety program.

L.     An August 2007 "Monthly Update Report" filed by Xcel noted that "[t]his complex project will be closely monitored and reviewed by the Xcel Safety consultant" and that the "Xcel Project Manager will be fully integrated into the contractor's safety program."

M.     During the pre-job planning by RPI, between August 14, 2007 and the first week of September 2007, equipment lists were consistently reviewed and amended. RPI instructed the foremen to hand pick all of the equipment specifically needed for this project. RPI discussed ventilation and air-flow in its pre-job planning process. RPI sent the paint sprayer out for maintenance just prior to the project. They sent the sprayer back out to have in-line heaters added because the Duromar had to be warmed prior to its application.

N.     On September 5, 2007, RPI and Xcel held a pre-construction meeting wherein Xcel and RPI agreed that personnel would receive confined space training.

O.     Xcel executives and management beyond just its company employees who worked at Cabin Creek were heavily involved in this project, including John Keahey, Xcel principal engineer and project manager. Mr. Keahey informed his Xcel colleagues that "the Cabin Creek penstock reline project will require my presence full time on the project." However, Keahey had not even completed the confined space entry-WEB training class.

P.     Xcel had a safety process in place for jobs which were subcontracted. Xcel also had a team of safety experts at its disposal That program is known as the "Contractor Safety Program" and included a document known as "Appendix B" that identified numerous

12

hazards associated with the project and/or job site, including:

1. Impact Hazard

2. Penetration or Puncture Hazards

3. Compressions Hazards

4. Cold Temperature Hazards

5. Fall Potential

6. Heavy Lifting Potential

7. Electrical Hazards

8. Hazardous Energy Control

9. Hot Work

10. Other Potential Hazards - "Will need GFCI in wet conditions. The penstock has a grade of 2-4 % and is covered with slick residue. Hazard may be created using combustion engines."

11. Respiratory Hazards

12. Painting or applying other surface coatings

13. Abrasive Blasting

14. Welding, cutting, grinding, scraping or sanding on painted surfaces

15. Excessive Noise

16. Confined Space Entry

17. Poor Lighting Conditions

18. Other Potential Hazards - "A Confined Space Air Monitor is required. The cylindrical shape of the 12-foot diameter Penstock may create ergonomic concerns."

13

Therefore, all the defendants were on notice that the penstock was a permit-required confined space subject to 29 C.F.R. 1910.146 and its regulations on or before July 2007.

Q.     Xcel indicated to RPI that it would conduct on-site safety and health inspections. Xcel instructed RPI that Xcel would designate and be responsible for notifying the rescue and emergency services. Additionally, Xcel contractually asserted that it would conduct regular safety inspections of the space.

R.     Xcel had the authority, under its "Stop Work Authority" provision, to order RPI to stop work on the project if Xcel considered the conditions unsafe. Xcel did not exercise this authority during the penstock project even though the hazards were readily apparent.

S.     On September 10, 2007, Vern Dillon, a certified OSHA trainer hired by RPI visited the project site and gave general/review training to some RPI employees in (1) confined space, (2) respirator training with fit test, (3) electrical safety, (4) lock out/tag out, (5) fall protection, and (6) hazardous communication. At this training, RPI foreman Gary Foster made site-specific comments about each topic that were related to the jobsite and the conditions he expected. At the end of each class, a test was given and reviewed. Prior to the classes starting, Mr. Foster asked Xcel if any of their employees would like to attend, but no one from Xcel attended any of the classes.

T.     John Keahey of Xcel instructed RPI's General Foreman to allow the "other trades" into the penstock; RPI did so based on its understanding (obtained from Xcel) that they had been trained. As a precaution, on September 15, 2007, RPI issued a handwritten letter stating that RPI would not be responsible for any accidents involving other tradesmen. On September 21, 2007 Xcel revoked the Release of Liability letters previously

14

signed by John Keahey.

U.      From about September 4, 2007 to October 2, 2007, RPI employees undertook blasting the old lining from the steel section of the penstock, under the supervision of Xcel.

V.      On September 20, 2007, an Xcel safety inspection check list noted that the penstock "environment continuously monitored" and noted that RPI had taken steps to remedy a dangerous condition ("extremely slick surfaces") by purchasing and supplying "elbow and knee pads for wear in interior of penstock and added as personal protective equipment." However, the air monitoring used to determine the environmental conditions inside the penstock was only done at the opening near the lower end of the penstock and not within the immediate work area.

W.      On September 22, 2007, John Keahy of Xcel sent an email to other Xcel personnel regarding the status of the project. In that update, he noted that "[w]ork conditions inside the penstock are highly hazardous on many levels. In the best of conditions, the coating removal is dirty, nasty work."

X.      On September 24, 2007, Defendant Philippe Goutagny, along with Defendant James Thompson, visited the job site and met with officials of Xcel. The Xcel representatives assured Messrs. Goutagny and Thompson that the project was going well and expressed no concerns about any aspect of the project. The topic of the meeting was the degree of abrasive blasting that Xcel required before application of the Duromar, as well as the erection of additional scaffolding so that the KTA-Tator representative, Gary Carver, could adequately evaluate the abrasive testing to ensure that it met with Xcel's specifications. At that time, Goutagny and Thompson were made aware of the combustible

engine transport, "the gator", inside the penstock and that Xcel employees had facilitated its placement inside the penstock.

Y.     Additionally, during the penstock relining project incidents occurred that posed health and safety hazards to employees working inside the penstock, and Xcel Energy, Inc., Public Service Company of Colorado, and RPI Coating, Inc., knew about those incidents. Nonetheless, Xcel Energy, Inc., Public Service Company of Colorado, and RPI Coating, Inc., did not comply with the permit required confined space regulations at 29 U.S.C. §1910.146. While RPI Coating, Inc. employees undertook blasting the old lining system from the steel pipe section and applying the new epoxy liner, they were under the supervision of Xcel Energy, Inc. and Public Service Company of Colorado. During that period, Xcel Energy, Inc. and Public Service Company of Colorado had their employees working intermittently inside the penstock, performing inspections, doing welding, supervising and inspecting the relining project, and other general industry activities.

Z.     RPI Coating, Inc. provided nine (9) fire extinguishers for use at the project site.     While RPI employees placed the fire extinguishers in the penstock during sandblasting, they removed them in preparation for coating and never put them back in the penstock. Thus, at the time of the fire, the fire extinguishes were located outside the penstock, at least 1200 feet from the area where the sprayer and workers were located. RPI had two (2) 55-gallon drums of methyl ethyl ketone (MEK) outside the penstock. MEK is a very common solvent. Gary Carver, the on-site representative for the quality control company KTA-Tator, stated that it is standard procedure to use a solvent to clean out lines of a sprayer. Xcel Energy, Inc. and Public Service Company of Colorado were familiar with MEK, and they knew that RPI Coating, Inc. had two 55-gallon drums of MEK on site for use

16

in the relining project and that MEK was recommended for use with the epoxy materials. It was foreseeable to Xcel Energy, Inc., Public Service Company of Colorado, and RPI Coating, Inc., that the workers would bring the MEK inside the penstock during the relining project and that the presence of MEK inside the penstock could cause injury or death to people working inside the penstock. The Duromar specifications instructed that if "any blockages or other stoppages occur, immediately shut off the heater, and place a clean bucket of solvent underneath the pump and flush the lines" as well as instructed that "[a]ny residue can be removed with a solvent such as . . . MEK." RPI's own quality assurance guidelines required: "For safety and environmental considerations all paint and coatings must be stored in secondary containment pallets, covered, and contained to assure compliance with local site parameters. For quality purposes, it may be necessary to maintain storage temperatures, and prevent exposure to the elements. Special requirements are to be addressed in a site-specific plan." RPI requires its employees to transfer flammable solvents such as MEK into approved safety containers. However, such safety containers were not used on the day of the fire..

AA.    On October 1, 2007, the day before the fire, Xcel employee Ken Cramsey conducted a job site check. All categories on the safety check list received a "satisfactory" or "not applicable" rating. The categories titled "Grounding in Place" and "Confined Space Entry Permit" were both marked as "satisfactory." However, the work site never had a confined space entry permit as required by law. In addition, Mr. Cramsey's notes indicate that he "went up the penstock about ¼ mile to see more of what is going on. All of the employee[s] at the time were wearing all of the PPE [personal protective equipment] needed." The notes go on to state that there was a person at the entry of the penstock

17

who was keeping track of all who entered and exited the penstock.

BB.    On October 2, 2007, RPI employee Kenny Shinn built a stage for the sprayer pump prior to the commencement of the Duromar application. RPI had tested the sprayer before October 2, 2007 in California, and it had functioned normally under the conditions at the RPI yard in California. RPI had also figured out the temperature settings of the sprayer prior to October 2, 2007. On the day of the fire, RPI workers were wearing air-purifying respirators.

CC.    On October 2, 2007 RPI prepared to apply the initial coat of the 2-part Duromar epoxy to the steel penstock. MEK was used to flush the Graco pumps and lines prior to commencing coating operations. During the initial application of the Duromar coating, RPI employees began to experience problems with the application of the coating. The 2-part Duromar coating was not flowing in such a manner to allow the even application of the epoxy to the steel penstock. One of the foreman believed the Graco pumps were not functioning properly and instructed RPI employees to clean the sprayer with MEK. The MEK was located outside the penstock in an industrial drum. At that time, there were numerous serious safety hazards in the penstock, including but not limited to the following:

1)    Supplies and equipment obstructing ingress and egress;

2)    Spent abrasive blasting materials creating slipping hazards;

3)    Inadequate ventilation;

4)    Electrical hazards including lack of grounding and non-explosion proof lighting;

5)    Lack of fire extinguishers;

6)    Lack of stand-by rescue or plan.

DD.    The MEK was retrieved from the larger drum outside the penstock and brought into the penstock in standard buckets. The MEK was poured into a hopper and left uncovered. An ignition source caused the MEK vapors to ignite, and the combustion by-products from that fire caused the death of the five RPI employees. There was only one viable egress point, which was located at the low end of the penstock. Five men – Gary Foster, Don DeJaynes, Dupree Holt, Anthony Aguirre, and James St. Peters – died at the Cabin Creek Hydro Plant, near Georgetown, Colorado. The fire was located between the five men who died and the egress point. During the fire, the five men retreated up the penstock. Several RPI employees located on the other side of the fire escaped the penstock and lived. RPI employees called the Cabin Creek control room operators as they had been instructed by Xcel, who, in turn, called 911. There was no qualified stand-by rescue available. Subsequently, numerous rescue and emergency responders unfamiliar with the interior of the penstock came to the plant and lowered self contained breathing apparatus to the men, but their efforts did not succeed in rescuing the five trapped men because the efforts were not timely.

EE.    RPI, as one of the multiple-employers at the work site, maintained its own safety manual, which addressed the some of the issues presented at the penstock site, including, by way of example, flammable liquids, open flames, hot particles, sparks, static electricity, ignition sources, and flash points. However, these provisions were not observed at the work site.

FF.    Although the RPI employees were trained in the basic knowledge of confined space entry, they were not trained in confined space emergency response and rescue.

GG.    Neither RPI nor Xcel properly permitted the penstock as a permit-required

confined space. Xcel had a history of entering the penstock without any type of permit and without a rescue plan in place.

HH.    Prior to the penstock relining project, Xcel Energy, Inc. and Public Service Company of Colorado consistently and erroneously treated the penstock as a non-permit-required confined space. Xcel had a general policy to not permit their employees to work inside a permit required confined space, including the penstock, and to convert the space to a non-permit required space by removal of all the hazards. The hazards were not removed in this case.

II.    Prior to this event, Xcel sent numerous employees into the penstock with no permit and with no rescue plan or rescue personnel in place.

JJ.    RPI was required to follow Xcel's policies and procedures. For example, Nick LeClercq, an Xcel employee, described Xcel as a "big brother" who was "always watching." When LeClercq was asked the question: "When the contractor was on site whose safety rules do they follow?" he responded: "Xcel's."

KK.    Xcel Energy, Inc., Public Service Company of Colorado, and RPI Coating, Inc., were aware that the relining project posed recognized serious health and safety hazards to their employees working inside the penstock. Additionally, during the penstock relining project incidents occurred that posed health and safety hazards to employees working inside the penstock, and Xcel Energy, Inc., Public Service Company of Colorado, and RPI Coating, Inc., knew about those incidents. Nonetheless, Xcel Energy, Inc., Public Service Company of Colorado, and RPI Coating, Inc., did not comply with the permit required confined space regulations at 29 C.F.R. §1910.146.

LL.    Xcel Energy, Inc. and Public Service Company of Colorado and others

violated applicable OSHA regulations which caused the deaths, as alleged in the Indictment, as follows:

1)      Xcel Energy, Inc. and Public Service Company of Colorado evaluated the penstock via hazard assessments, but they did not determine that the penstock was a permit-required confined space.

2)      Xcel Energy, Inc. and Public Service Company of Colorado did not inform their exposed employees, by posting danger signs and by other equally effective means, of the existence and location of and the danger posed by entry into the penstock for the relining project.

3)      Xcel Energy, Inc. and Public Service Company of Colorado did not develop and implement a written permit space program for the Cabin Creek job that complied with §146.

4)      Xcel Energy, Inc. and Public Service Company of Colorado arranged to have employees of another employer, RPI Coating, Inc., perform work inside the penstock that involved permit space entry, but they did not inform RPI Coating, Inc. that the penstock was a permit space and that entry was allowed only through compliance with a permit space program meeting the requirements of §146.

5)      Xcel Energy, Inc. and Public Service Company of Colorado developed and implemented a procedure for summoning rescue and emergency services – which was call the Cabin Creek control room operators, who would then call 911 – but they did not develop and implement procedures for rescuing entrants from permit spaces.

6)      Xcel Energy, Inc. and Public Service Company of Colorado , and RPI Coating, Inc. were required to comply with §146(k)(1)(i). RPI Coating, Inc. discussed with

Xcel Energy, Inc. and Public Service Company of Colorado what should be done in the event rescue and emergency services were needed. Xcel Energy, Inc. and Public Service Company of Colorado directed RPI Coating, Inc. to call the Cabin Creek control room operators, who would call 911. However, Xcel Energy, Inc. and Public Service Company of Colorado did not evaluate the prospective rescuers' ability to respond in a timely manner, considering the hazards identified.

7)    Xcel Energy, Inc. and Public Service Company of Colorado, and RPI Coating, Inc. were required to comply with §146(k)(1)(ii). RPI Coating, Inc. discussed with Xcel Energy, Inc. and Public Service Company of Colorado what should be done in the event rescue and emergency services were needed.    Xcel Energy, Inc. and Public Service Company of Colorado directed RPI Coating, Inc. to call the Cabin Creek control room operators, who would call 911. However, Xcel Energy, Inc. and Public Service Company of Colorado did not evaluate the prospective rescuers' ability, in terms of proficiency with rescue-related tasks and equipment, to function appropriately while rescuing entrants from the permit space.

8)    Xcel Energy, Inc. and Public Service Company of Colorado, and RPI Coating, Inc. were required to comply with §146(k)(1)(iii). RPI Coating, Inc.. discussed with Xcel Energy, Inc. and Public Service Company of Colorado what should be done in the event rescue and emergency services were needed.    Xcel Energy, Inc. and Public Service Company of Colorado directed RPI Coating, Inc. to call the Cabin Creek control room operators, who would call 911. However, Xcel Energy, Inc. and Public Service Company of Colorado did not select a rescue team and service that had the capability to reach victims within a time frame that was appropriate for the permit space hazards identified and that

22

was equipped for and proficient in performing the needed rescue services.

9)     Xcel Energy, Inc. and Public Service Company of Colorado, and RPI Coating, Inc. were required to comply with §146(k)(1)(iv). RPI Coating, Inc. discussed with Xcel Energy, Inc. and Public Service Company of Colorado what should be done in the event rescue and emergency services were needed. Xcel Energy, Inc. and Public Service Company of Colorado directed RPI Coating, Inc. to call the Cabin Creek control room operators, who would call 911. However, Xcel Energy, Inc. and Public Service Company of Colorado did not inform each rescue service of the hazards they may confront when called on to perform rescue at the site.

10)     Xcel Energy, Inc. and Public Service Company of Colorado, and RPI Coating, Inc. were required to comply with §146(k)(1)(v). RPI Coating, Inc. discussed with Xcel Energy, Inc. and Public Service Company of Colorado what should be done in the event rescue and emergency services were needed. Xcel Energy, Inc. and Public Service Company of Colorado directed RPI Coating, Inc. to call the Cabin Creek control room operators, who would call 911. However, Xcel Energy, Inc. and Public Service Company of Colorado did not provide the rescue team and service selected with access to all permit spaces from which rescue may be necessary so that the rescue service could develop appropriate rescue plans and practice rescue operations.

MM.     Defendant RPI violated the applicable OSHA regulations which caused the deaths, as alleged in the Indictment, as follows:

1)     RPI Coating, Inc. did not properly evaluate the workplace to determine whether any spaces were permit-required confined spaces, in violation of 29 CFR 1910.146(c)(1).

23

2)      RPI Coating, Inc. did not inform exposed employees, by posting danger signs or by any other equally effective means, of the existence and location of and the danger posed by the permit spaces, in violation of 29 CFR 1910.146(c)(2).

3)      RPI Coating, Inc did not develop and implement a written permit space program for the Cabin Creek job that complied with the confined space standard, in violation of 29 CFR 1910.146(c)(4).

4)      RPI Coating, Inc. did not identify and evaluate the hazards of the penstock before their employees entered it, in violation of 29 CFR 1910.146(d)(2).

5)      RPI Coating, Inc. installed a ventilation system in the penstock that was insufficient to ventilate it as necessary to eliminate and control atmospheric hazards, in violation of 29 CFR 1910.146(d)(3)(iv).

6)      RPI Coating, Inc. failed to maintain components of the ventilation system that were necessary to obtain acceptable entry conditions, in violation of 29 CFR 1910.146(d)(4)(ii).

7)      RPI Coating, Inc. failed to monitor the air where employees were working in the penstock, in violation of 29 CFR §§ 1910.146(d)(5)(i) and 1910.146(d)(5)(ii).

8)      RPI Coating, Inc. failed to develop and implement procedures for rescuing employees from permit spaces, in violation of 29 CFR 1910.146(d)(9).

9)      RPI Coating, Inc. had reason to believe that the measures taken might not adequately protect employees, based on its own observations of the penstock, its knowledge that the sprayer would be located inside the penstock, and events occurring inside the penstock during the job. Despite its knowledge, RPI Coating, Inc. failed to review its entry operations, and failed to revise its permit space entry program, in violation

of 29 CFR 1910.146(d)(13).

     10)    RPI Coating, Inc. failed to evaluate a prospective rescue service's ability to respond to a rescue summons in a timely manner, considering the hazards identified, in violation of 29 CFR 1910.146(k)(1)(i).

     11)    RPI Coating, Inc. failed to evaluate a prospective rescue service's ability to function appropriately while rescuing entrants from the penstock, in violation of 29 CFR 1910.146(k)(1)(ii).

     12)    RPI Coating, Inc. failed to select a rescue service that was capable of reaching victims within a time frame that was appropriate given the confined space hazards existing in the penstock, and that was equipped for and proficient in performing the needed rescue services, in violation of 29 CFR 1910.146(k)(1)(iii).

     13)    RPI Coating, Inc. failed to inform any rescue services of the hazards they may confront when called on to perform a rescue at the site, in violation of 29 CFR 1910.146(k)(1)(iv).

     14)    RPI Coating, Inc. failed to provide the selected rescue service with access to all permit spaces from which rescue may be necessary, so that the service could develop appropriate rescue plans and practice rescue operations, in violation of 29 CFR 1910.146(k)(1)(v).

     15)    RPI Coating, Inc. maintained MEK inside the penstock in uncovered buckets when not actually in use, in violation of 29 CFR 1910.106(e)(2)(iv)(a).

     16)    RPI Coating, Inc. used MEK, a Class 1 liquid, inside the penstock where there were sources of ignition within the possible path of vapor travel, in violation of 29 CFR 1910.106(e)(2)(iv)(c).

17)    RPI Coating, Inc. drew and transferred MEK into vessels, containers, and portable tanks within the penstock by various means, including by pouring MEK from plastic buckets into the sprayer's hoppers, and by pumping MEK from plastic buckets into the sprayer, in violation of 29 CFR 1910.106(e)(2)(iv)(d).

18)    RPI Coating, Inc. failed to take adequate precautions to prevent the ignition of flammable vapors, in that it failed to adequately control and eliminate MEK vapors and all sources of ignition, in violation of 29 CFR 1910.106(e)(6)(i).

19)    RPI Coating, Inc. selected certain equipment that was not rated to be used in classified locations, including lights, a sprayer, and power distribution centers, in violation of 29 CFR 1910.106(e)(7)(i)(a).

20)    RPI Coating, Inc. used a sprayer inside the penstock that did not have a permanent, continuous, and effective path to ground, in violation of 29 CFR 1910.304(g)(5).

21)    RPI Coating, Inc. failed to distribute portable fire extinguishers inside the penstock in violation of 29 CFR §§ 1910.157(d)(1) and 1910.157(d)(4).

## V.  SENTENCING COMPUTATION

The parties understand that the United States Sentencing Guidelines are inapplicable to the sentencing before the Court because the offenses of conviction are Class B misdemeanors, and that a sentence should be imposed pursuant to the sentencing factors in 18 U.S.C. 3553. However, the parties provide these Guideline computations to assist the Court and BY WAY OF ILLUSTRATION the sentence that might be derived if the Sentencing Guidelines were indeed applicable.

The parties understand that the Court may impose any sentence up to the statutory

maximum sentence, regardless of any Guideline range computed, and that the Court is not bound by any position of the parties. U.S.S.G. § 6B1.4(d). The parties understand that the Sentencing Guidelines are advisory. The Court is free, pursuant to U.S.S.G. §§ 6A1.3 and 6B1.4, to reach its own findings of facts and sentencing factors considering the parties' stipulations, the presentence investigation, and any other relevant information. U.S.S.G. § 6B1.4 comment.; U.S.S.G. § 1B1.4.

A.    The base guideline provision applicable to these types of offenses is U.S.S.G. § 2X5.2 which applies to a Class A Misdemeanor not covered by another specific offense guideline. U.S.S.G. § 2X5.2 provides for a base offense level of 6.[6] Therefore the base offense level is 6.

B.    There is no aggravating role adjustment pursuant to U.S.S.G. §3B1.1. The resulting offense level remains 6.

C.    Because violation of the offenses of conviction resulted in 5 deaths, pursuant to the grouping rules of U.S.S.G. §3D1.1 and §3D1.4, there is a 4 level adjustment

---

[6] Chapter 8 of the United States Sentencing Guidelines, particularly § 8C2.8, specifies the factors the Court may take into account in determining and appropriate fine, including the following: (1) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes of the organization; (2) the organization's role in the offense; (3) any collateral consequences of conviction, including civil obligations arising from the organization's conduct; (4) any pecuniary loss caused or threatened by the offense; (5) whether the offense involved a vulnerable victim; (6) any prior criminal record of an individual within high-level personnel of the organization who participated in, condoned, or was willfully ignorant of the criminal conduct; (7) any prior civil or criminal misconduct by the organization other than that counted under § 8C2.5(c); (8) any culpability score...higher than 10 or lower than 0; (9) partial but incomplete satisfaction of the conditions for one or more of the mitigating or aggravating factors set forth in § 8C2.5; (10) any facor listed in 18 USC 3572(a); and (11) whether the organization failed to have, at the time of the instant offense, an effective compliance and ethics program within the meaning of § 8b2.1.

resulting in an offense level of 10.

D.     Pursuant to U.S.S.G. § 3E1.1(a), defendant has demonstrated acceptance of responsibility as to the offense of conviction. A two-level downward adjustment results in an offense level of 8.

E.     The parties understand that the defendant's criminal history computation is tentative. The criminal history category (CHC) is determined by the Court. At this stage, it appears that the defendant has no criminal history, resulting in a CHC of I.

F.     The Guideline range resulting from the estimated offense level of 8, and the tentative CHC of I, is 0 to 6 months. However, imprisonment is not available for this organizational defendant.

G.     Pursuant to U.S.S.G. § 5E1.2 and 18 U.S.C § 3571, assuming an offense level of 8, the fine range for this offense is $1000.00 to $2,500,000.00 ($500,000.00 on each count) plus applicable interest and penalties.

H.     Pursuant to 18 U.S.C. § 3583(b)(3), the Court may impose a term of supervised release of up to one year if a term of imprisonment is imposed.

I.     Pursuant to 18 U.S.C. § 3561 , the Court may sentence this defendant to a term of up to 5 years probation, and may impose conditions it deems appropriate after applying the factors in 18 U.S.C. § 3553(a). See 18 U.S.C. § 3561.

## VI. WHY THE PROPOSED PLEA DISPOSITION IS APPROPRIATE

The parties believe the sentencing range resulting from the proposed plea agreement is appropriate because all relevant conduct directly attributable to this defendant is disclosed, the sentencing guidelines and 18 U.S.C. § 3553 permit the court to

take into account all pertinent sentencing factors with respect to this defendant, and the charges to which the defendant has agreed to plead guilty adequately reflect the seriousness of the actual offense behavior.

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date: 12/19/2011

Philippe Goutaghy Authorized Representative of
RPI Coating, Inc., Defendant

Date: 12/19/11

Larry Pozner
Attorney for Defendant

Date: 12/19/11

Jaime A. Pena
Assistant U.S. Attorney

29